944 F.2d 1199
 1994 A.M.C. 302
 McDERMOTT INTERNATIONAL, INC., Plaintiff-Appellee,
v.
LLOYDS UNDERWRITERS OF LONDON, John Richard Ludbrooke Youell
as rep of those Certain Underwriters Subscribing
to Memorandum of Insurance No. 104207,
Defendant-Appellant.
 No. 91-3568.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 3, 1991.
Rehearing and Rehearing En Banc
Denied Oct. 30, 1991.
 
 Chuck D. Barlow, Carlton Reeves, Luther T. Munford, Phelps Dunbar, Marks, Claverie & Sims, Jackson, Miss., James H. Roussel, Danny G. Shaw, Harry S. Redmon, Jr., Bruce V. Schewe, Phelps Dunbar, New Orleans, La., for defendants-appellants.
 John V. Baus, Bruce J. Brumfield, Nan Roberts Eitel, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., Arden J. Lea, W. Clay McGehee, Lea, Plavnicky & Moseley, New Orleans, La., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before REAVLEY, JONES and SMITH, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The district court remanded this case to state court on the ground that an insurance policy issued by underwriters at Lloyds, London (Underwriters) to McDermott International, Inc. (McDermott) gave McDermott the right to choose the forum where the policy's arbitration provision would be enforced. We consider the court's remand order appealable and vacate it.
 
 I. BACKGROUND
 
 2
 McDermott bought an all risks installation floater policy from Underwriters every year from 1952 to 1989. This case concerns construction of the following two clauses in the 1989 policy:
 
 8. Service of Suit Clause
 
 3
 It is agreed that in the event of the failure of Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the Assured will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.
 
 
 4
 It is further agreed that service of process in such suit may be made upon Messrs. Mendes & Mount, Three Park Avenue, New York, N.Y. 10016 and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.
 
 
 5
 The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.
 
 
 6
 . . . . .
 
 9. Arbitration
 
 7
 All differences arising out of this contract shall be referred to the decision of any arbitrator to be appointed by the parties in difference, or if they cannot agree upon a single arbitrator to the decision of two arbitrators, one to be appointed in writing by each of the parties and in case of disagreement between the two arbitrators to the decision of any umpire to be appointed in writing by the arbitrators or by a court of competent jurisdiction within the limits of the United States of America. It is agreed that the place of arbitration shall be designated by the Assured and the expenses in connection with the arbitration shall be borne equally between the parties in difference.
 
 
 8
 McDermott's subsidiary, the Babcock and Wilcox Company (B & W), supplies utilities with electric power generation equipment and structures. In 1989, a chemical reaction irreparably damaged two air heat exchangers that B & W was installing for Baltimore Gas & Electric Company.
 
 
 9
 McDermott submitted a policy claim for its losses from the Baltimore incident, Underwriters denied coverage, and McDermott sued on the policy for $39,247,000 in Louisiana state court. Underwriters demanded that McDermott submit to arbitration of the issues in the state suit. The demand prompted McDermott to file a separate petition asking the Louisiana court to declare that McDermott had no obligation to arbitrate.
 
 
 10
 Underwriters removed both suits to federal district court under 9 U.S.C. § 205. McDermott filed a motion to remand the cases. The district court held that City of Rose City v. Nutmeg Ins. Co., 931 F.2d 13 (5th Cir.1991) establishes that, pursuant to the policy's service-of-suit clause, McDermott is entitled to choose the forum where the parties' dispute regarding arbitration will be resolved. The court remanded the cases to Louisiana state court.
 
 
 11
 McDermott asks us to review the district court's remand order either by appeal or writ of mandamus.
 
 II. APPELLATE JURISDICTION
 
 12
 We hold that the district court's remand order is appealable, but this requires explanation. We begin with the proposition that the availability and means of appellate review for a district court's remand order depend entirely on the court's reason for issuing the order.[1]
 
 A. UNREVIEWABLE REMAND ORDERS
 
 13
 Congress denies us authority to review remand orders that district courts issue under 28 U.S.C. § 1447(c) for lack of subject-matter jurisdiction. 28 U.S.C. § 1447(d). And although the question is presently undecided, section 1447(d) may also preclude our review of a district court's granting of a timely motion to remand due to defects in removal procedure. In re Shell Oil Co., 932 F.2d 1518, 1520 n. 5 (5th Cir.1991). The district court remanded this case pursuant to the policy's service-of-suit clause, a reason outside the scope of section 1447(c). Section 1447(d) does not bar our review. Id. at 1520-21.
 
 
 14
 B. APPELLATE REVIEW BY APPEAL VERSUS MANDAMUS
 
 
 15
 The parties dispute whether review is appropriate by appeal or mandamus. These methods of review are mutually exclusive, Moses H. Cone Memorial Hosp. v. Mercury Construction Corp., 460 U.S. 1, 8 n. 6, 103 S.Ct. 927, 933 n. 6, 74 L.Ed.2d 765 (1983), and we look to precedent to decide which to exercise in this case.
 
 
 16
 In Thermtron, the Supreme Court held that remand is only allowed in accordance with section 1447(c) and a writ of mandamus under 28 U.S.C. § 1651 is the proper tool for securing a district judge's compliance with this rule. Id. 423 U.S. at 352-53, 96 S.Ct. at 593-94 (ordering district judge to hear case remanded due to crowded federal docket). The Court chose to review by mandamus because it understood its precedent to establish that a remand order is not a "final decision" within the meaning of the direct appeal statute, 28 U.S.C. § 1291.[2] Id. at 352-53, 96 S.Ct. at 594 ("because an order remanding a removed action does not represent a final judgment reviewable by appeal, '[t]he remedy in such a case is by mandamus to compel action....' ") (quoting Railroad Co. v. Wiswall, 90 U.S. (23 Wall.) 507, 508, 23 L.Ed. 103 (1875)).[3]
 
 
 17
 The Court next chose between direct appeal and mandamus in Moses H. Cone. Like this case, Moses H. Cone concerned the question of whether the arbitrability of a dispute between a hospital and a contractor would be decided in federal or state court. The hospital sued the contractor in state court for a declaration that their dispute was not subject to arbitration. The contractor then filed a separate action in federal court to resolve the same arbitrability question. The district court exercised its discretion under Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) to stay the federal proceeding pending resolution of the state suit. Moses H. Cone, 460 U.S. at 4-7, 103 S.Ct. at 931-32. The Court held that the district court's stay order was an appealable collateral order under Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) because it: 1) conclusively determined the issue of which forum would decide the arbitrability question; 2) resolved this important issue that was completely separate from the merits of the action; and 3) was effectively unreviewable on appeal from a final judgment in the case. Id. at 11-13, 103 S.Ct. at 934-35. Moses H. Cone does not mention Thermtron.
 
 
 18
 The Court last considered remand review in Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 621-22, 98 L.Ed.2d 720 (1988). There, the district court allowed the plaintiff in an age discrimination suit to delete the federal claims from his complaint and remanded the remaining pendent claims to state court. The defendant employer filed a notice of appeal and a petition for mandamus with the Third Circuit to keep the case in federal court. A panel of the Third Circuit held the appeal barred by section 1447(d) but granted the petition for mandamus. See Id. 108 S.Ct. at 617 & n. 4. Sitting en banc, the Third Circuit reversed the panel's decision to grant mandamus. The Supreme Court affirmed the en banc decision, ruling that a district court may remand pendent claims when it has the discretion to dismiss them even though no statute sanctions such a remand. Id. at 622.
 
 
 19
 Cohill is important to our resolution of this case because it expressly precludes our reading Thermtron to require statutory authorization for all remands. Id. at 621. However, Cohill does not address the issue of whether review of a district court's discretionary remand order should be by appeal under Moses H. Cone 's rationale[4] or by mandamus. The Court simply affirmed the en banc court's final decision to refuse mandamus. Although the defendant employer could have put before the Supreme Court the panel decision to review the district court's remand order by mandamus rather than appeal, it did not do so. See Brief of Petitioners, Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), (LEXIS, Genfed library, Briefs file) (only question presented was whether district court could remand on ground not listed in section 1447(c)).
 
 
 20
 We read Thermtron, Moses H. Cone, and Cohill to instruct that we review the district court's remand order, which the court issued pursuant to the parties' contract, on appeal under Cohen's collateral order doctrine. Thermtron requires review by mandamus only when a district court has remanded a case without authority to do so. When the Court issued Thermtron, a district court's only authority for remanding a case was section 1447(c), and review of section 1447(c) remands is barred by section 1447(d). Then Cohill established that remand is appropriate when a district court has discretion to dismiss a case. This court has recognized a district court's authority to remand a case pursuant to the parties' contract. Nutmeg, 931 F.2d at 16 (directing district court to remand); see also M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 8-12, 92 S.Ct. 1907, 1912-14, 32 L.Ed.2d 513 (1972) (district court must enforce forum selection clause directing dispute to London Court of Justice unless resisting party shows enforcement to be unreasonable). Meanwhile, Moses H. Cone established that a district court's stay that effectively allows a state court to decide the question of arbitrability is an appealable collateral order.[5] The court's remand order here has the same effect on resolution of the identical issue, and we do not believe that we are restricted to the Thermtron review methodology simply because the procedural posture of this case allowed the district court to issue a remand order rather than a stay.[6]
 
 
 21
 Thermtron and its progeny use mandamus to require district judges to decide issues of remand on proper grounds. In Moses H. Cone, however, the Court never questioned that it was within the district court's discretion to stay the federal proceeding pursuant to Colorado River. Moses H. Cone simply explained that the district court abused that discretion. 460 U.S. at 19, 103 S.Ct. at 938. Because under Cohill and Nutmeg, district courts have authority to remand cases pursuant to contract, the district judge here did not act without authority; mandamus under Thermtron is inappropriate. See Schlagenhauf v. Holder, 379 U.S. 104, 112, 85 S.Ct. 234, 239, 13 L.Ed.2d 152 (1964) ("[t]he writ of mandamus is not to be used when 'the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction' ") (quoting Parr v. United States, 351 U.S. 513, 520, 76 S.Ct. 912, 917, 100 L.Ed. 1377 (1956)). Here we are concerned with the propriety of the district court's contract construction, and Moses H. Cone permits us to review the court's collateral remand order by direct appeal.[7]
 
 
 22
 Our reasoning and decision as to the proper means of review of the district court's order accord with the four other courts of appeals that have considered this question. Foster v. Chesapeake Ins. Co., Ltd., 933 F.2d 1207, 1211 n. 6 (3d Cir.1991); Regis Associates v. Rank Hotels (Management), Ltd., 894 F.2d 193, 194-95 (6th Cir.1990); Karl Koch, 838 F.2d at 658-59 & n. 1 (2d Cir.1988); Pelleport Investors, Inc. v. Budco Quality Theatres, Inc., 741 F.2d 273, 277-78 (9th Cir.1984).
 
 
 23
 This court has never before reviewed a district court's remand order and found that the court issued the order on a nonstatutory, yet permissible, basis. Our prior cases all concern courts' attempts to remand for reasons other than those allowed under federal statute, contract, or discretionary dismissal jurisprudence.[8] See In re Shell Oil Co., 932 F.2d at 1519-21 (remand based on untimely motion to remand for lack of removal jurisdiction ordered retracted by mandamus); In re Allied-Signal, Inc., 919 F.2d 277, 279 (5th Cir.1990) (remand based on state statute purporting to direct suits against political subdivisions to state court ordered retracted by mandamus); In re Shell Oil Co., 631 F.2d 1156, 1157-58 (5th Cir. Unit A 1980) (remand premised on lack of timely opposition to remand motion ordered retracted by mandamus).
 
 
 24
 To summarize, a district court may remand a case pursuant to a statute, a contract between the parties, or when it has discretion to dismiss the action. We review by mandamus allegations that the court has remanded for any other reason. Congress prohibits us from reviewing remand orders based on section 1447(c). We review contractual remand orders by direct appeal.
 
 III. MERITS
 
 25
 Our resolution of this case is complicated by the fact that the parties by their contract, Congress by statute, and this court by precedent have all stated legal standards that we must apply to the issues now disputed. Our decision accords with these standards while respecting the legitimate concern of the international business community for prompt and predictable resolution of forum choice disputes.
 
 A. THE PARTIES: CONTRACT AMBIGUITY
 
 26
 We review the district court's interpretation of the policy de novo, USX Corp. v. Tanenbaum, 868 F.2d 1455, 1457 (5th Cir.1989), and find that Underwriters did not unambiguously give McDermott the right to choose which forum would decide the arbitrability of their policy disputes. We recognize two alternate readings of the policy's service-of-suit and arbitration clauses.
 
 
 27
 1. Service-of-Suit as Alternate Forum Selection Clause
 
 
 28
 When a policy's service-of-suit clause applies, its probable effect is to waive the insurer's removal rights. See, e.g., Nutmeg, 931 F.2d at 15-16; Cessna Aircraft Co. v. Fidelity & Casualty Co. of New York, 616 F.Supp. 671, 674 (D.N.J.1985). But the policy's service-of-suit clause does not necessarily apply to disputes concerning the proper forum to decide arbitrability questions. The service-of-suit clause applies "in the event of the failure of Underwriters ... to pay any amount claimed to be due [under the policy]." McDermott and the district court reasoned that Underwriters' denial of McDermott's policy claim invoked the policy's service-of-suit clause, but they ignore the policy's arbitration clause in doing so. See Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A., 760 F.2d 390, 395-96 (2d Cir.1985) ("where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect").
 
 
 29
 If the service-of-suit clause is a forum selection clause, the arbitration clause is a co-equal forum selection clause. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985) (arbitration agreement is a forum choice). The arbitration clause applies to "all differences arising our of [the policy] contract." The questions of whether the parties' coverage dispute is arbitrable and who decides arbitrability are undoubtedly differences arising out of the policy. See Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co. (Pemex), 767 F.2d 1140, 1150 n. 26 (5th Cir.1985) (arbitrators should decide arbitrability questions after court determines that dispute subject matter is covered by the arbitration clause and party initiating arbitration is covered by clause).
 
 
 30
 Underwriters executed the policy thinking that a subset of all disputes--those arising from the policy--would be determined by arbitration. The service-of-suit clause's "failure to pay a claim" provision could be interpreted consistent with the arbitration clause to apply to suits concerning enforcement of an arbitration award. See NECA Ins., Ltd. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 595 F.Supp. 955, 958 (S.D.N.Y.1984) (arbitration not waived by service-of-suit clause because service-of-suit clause only "designed to guarantee the enforcement of arbitration awards"); see also Hart v. Orion Ins. Co., 453 F.2d 1358, 1361 (10th Cir.1971) (unspecified service-of-suit clause consistent with arbitration clause). Enforcement suits do not concern differences arising from the parties' contract, but rather differences concerning the propriety of the arbitration proceedings held pursuant to that contract. Thus, the policy may be read as contemplating that a claim for failure to pay under the policy not be made in court until after an arbitration proceeding.[9]
 
 
 31
 The parties did not consider in their contract that a court order may be necessary to compel arbitration. It is just as likely that the parties did not provide for this contingency in their agreement as it is that they intended the service-of-suit clause to apply to all disputes not actually arbitrated. That the service-of-suit clause applies only when Underwriters refuses to pay, instead of "to all disputes not submitted to arbitration," increases the plausibility of the former interpretation. We also wonder why Underwriters would secure an almost infinitely broad arbitration clause and also permit McDermott to attack it in the court of its choice.
 
 
 32
 2. Service-of-Suit as Submission to Personal Jurisdiction
 
 
 33
 When McDermott first bought a Lloyds, London policy containing the service-of-suit clause in 1952, this court did not enforce agreements to waive removal rights. See Carbon Black Export, Inc. v. The SS Monrosa, 254 F.2d 297, 300-301 (5th Cir.1958), cert. dismissed, 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959), disapproved by M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9, 92 S.Ct. 1907, 1912-13, 32 L.Ed.2d 513 (1972). Underwriters thus possibly understood that by allowing the service-of-suit clause, they only consented to personal jurisdiction in a court selected by McDermott, but they did not waive any removal rights.[10]
 
 
 34
 The service-of-suit clause does not explicitly waive Underwriters' removal rights. It requires Underwriters to "submit to the jurisdiction of any court [chosen by McDermott]," "comply with all requirements necessary to give such Court jurisdiction," and "abide by the final decision of such Court." It also decrees that "all matters arising hereunder shall be determined in accordance with the law and practice of [the court chosen by McDermott]." Underwriters' exercise of its federal removal right is not necessarily inconsistent with any of its obligations under the service-of-suit clause. Underwriters may remove a case after submitting to the jurisdiction of Louisiana's courts and complying with all necessary requirements to give Louisiana's courts power over the suit. There would be no final decision in that court for Underwriters to abide by if it exercised its removal right. All matters would be determined in accordance with the practice and law of the court chosen by McDermott in the sense that all state courts follow the removal law established by Congress. See Keaty v. Freeport Indonesia, Inc., 503 F.2d 955, 956-57 (5th Cir.1974) (directing federal district court in Louisiana to proceed with removed action despite contract that "shall be construed and enforceable according to the law of the State of New York" and wherein the "parties submit to the jurisdiction of the courts of New York").
 
 
 35
 At least one court has recognized that the same service-of-suit clause at issue here could be read to waive only objections to personal jurisdiction. In re Delta America Re Ins. Co., 900 F.2d 890, 893 (6th Cir.), cert. denied, Wright v. Arion Ins. Co., --- U.S. ----, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990).
 
 
 36
 The existence of these alternate possible policy interpretations, in concert with the parties' stipulation that before this litigation, neither expressed an opinion as to the effect of the service-of-suit clause on removability or the relationship between the service-of-suit and arbitration clauses, requires us to look to another authoritative source in deciding this case.
 
 
 37
 B. THIS COURT: CITY OF ROSE CITY V. NUTMEG INS. CO.
 
 
 38
 McDermott urges us to follow Nutmeg, where this court held that policy language virtually identical to the service-of-suit clause in this case waived the insurer's removal rights. See 931 F.2d at 16. But just as the same word may mean different things in different contracts, this case demonstrates that the effect of a contract clause may legitimately vary depending on the contract in which the clause lives. The Nutmeg court based its reasoning on facts that do not exist in this case, so Nutmeg does not control our decision.
 
 
 39
 Nutmeg Insurance Company relied on diversity jurisdiction to remove a suit filed by its policyholder's assignee in Texas state court. Record at 2, City of Rose City v. Nutmeg Ins. Co. (No. 90-0373). The district court refused the assignee's remand motion and granted Nutmeg summary judgment. This court reversed, holding that the district court should have remanded the case in accordance with the service-of-suit clause in Nutmeg's policy. The Nutmeg court agreed with the reasoning of several district courts that applied the "principle that ambiguities in contracts of insurance are to be construed against the drafter of the policy" in prior cases interpreting service-of-suit clauses. 931 F.2d at 15. Moreover, the court found Nutmeg's interpretation of the service-of-suit clause--that it only concedes personal jurisdiction as understood by the Sixth Circuit in Delta--wholly untenable because, unlike the defendants in Delta, Nutmeg is a domestic corporation with its principal place of business in the United States. Id. Faced with no alternative meaning for the service-of-suit clause, language strongly implying waiver of removal rights, and the policy drafter principle, the court naturally held that Nutmeg waived its removal rights.
 
 1. Lack of Ambiguity
 
 40
 The policy at issue in Nutmeg featured the service-of-suit clause as its only forum selection clause. As previously explained, the policy at issue here has two forum selection clauses that apply to different types of disputes. The arbitration clause's existence creates the possibility, not present in Nutmeg, that the parties would argue over arbitrability, and thus where arbitrability questions would be decided. The question presented to both courts in Nutmeg was whether Nutmeg was liable on its policy, a question that unmistakably invokes the service-of-suit clause's "failure ... to pay" application language. But, as we have explained, the service-of-suit clause does not necessarily apply here because a suit to determine arbitrability is not necessarily a suit for failure to pay a claim.
 
 
 41
 Also, the Nutmeg court rejected the suggestion that the service-of-suit clause only concedes personal jurisdiction because Nutmeg is a domestic corporation with its principal place of business in the United States. But the court stated that it "made some sense" for the Delta court to read the service-of-suit clause there as only waiving objections to personal jurisdiction because it was possible that some of the Delta defendants "were foreign corporations not otherwise subject to the jurisdiction of any court in the United States...." Id. McDermott does not dispute the fact that at least some of their policy's underwriters are foreign citizens.
 
 
 42
 The existence of alternate possible meanings for the service-of-suit clause in the policy here at issue distinguishes Nutmeg.
 
 2. Drafter Principle
 
 43
 Also unlike Nutmeg, here the principle that policy ambiguities are construed against the drafter does not help McDermott. While Underwriters' agents originally drafted the language of the service-of-suit clause, McDermott chose the clause for their policy. A broker representing McDermott in 1989, J.H. Minet, Inc., prepared a "slip" for Underwriters' approval. This slip merely listed the standard Lloyds, London clauses that McDermott wanted in the policy, including the service-of-suit clause. After Underwriters approved the slip submitted by Minet, Minet prepared a policy based on the slip. Then Underwriters' agent, the Lloyds Policy Signing Office, checked the policy submitted by Minet against the slip approved by Underwriters and executed the policy.
 
 
 44
 By having its agent decide upon both the slip and the policy, McDermott forfeits any benefit from the policy drafter principle. See Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 (5th Cir.1976) (principle does not apply where "[i]n substance the authorship of the policy is attributable to both parties alike"), cert. denied, 431 U.S. 967, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977); see also Delta, 900 F.2d at 892 n. 4 (principle of resolving ambiguities against drafter of little value when parties have relatively equal sophistication and bargaining power).[11] Without the presumption afforded by the policy drafter principle, and in the face of alternate possible interpretations of the service-of-suit clause, McDermott cannot rely on Nutmeg.
 
 C. CONGRESS: THE CONVENTION ACT
 
 45
 In 1970, Congress ratified the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention) to secure for United States citizens predictable enforcement by foreign governments of certain arbitral contracts and awards made in this and other signatory nations. See 21 U.S.T. 2517, T.I.A.S. 6997, reprinted following 9 U.S.C.A. § 201 (West Supp.1991). To gain rights under the Convention, though, Congress had to guarantee enforcement of arbitral contracts and awards made pursuant to the Convention in United States courts. See Convention Art. XIV ("A Contracting State shall not be entitled to avail itself of the present convention against other Contracting States except to the extent that it is itself bound to apply the Convention."). So Congress promulgated the Convention Act in 1970 to establish procedures for our courts to implement the Convention. 9 U.S.C. § 201, et seq.
 
 
 46
 The Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., is the approximate domestic equivalent of the Convention; it guarantees enforcement of domestic arbitral contracts and awards, but with slightly different rules of applicability. To avoid possible interference with the well-settled jurisprudence construing the FAA, Congress enacted new legislation in the Convention Act rather than amending the FAA. The Convention Act incorporates the FAA except where the FAA conflicts with the Convention Act's few specific provisions. SENATE COMM. ON FOREIGN RELATIONS, FOREIGN ARBITRAL AWARDS, S.REP. NO. 702, 91st Cong., 2d Sess. 5 (1970), U.S.Code Cong. & Admin.News 1970, p. 3601; 9 U.S.C. § 208.
 
 
 47
 The parties recognize that this suit concerns an arbitration agreement and is not entirely between United States citizens, so the Convention Act governs this case. 9 U.S.C. § 202. Underwriters removed this case pursuant to the Convention Act:
 
 
 48
 Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.
 
 
 49
 9 U.S.C. § 205.
 
 
 50
 Underwriters argue that Congress enacted the last sentence of section 205 to confer on international litigants a nonwaivable right to a federal forum for the resolution of Convention disputes.[12] We disagree. Underwriters focus only on the part of section 205's last sentence that says "any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed." Taken out of context, this imperative language seems to preclude remand of cases removed under section 205. But Underwriters reading of section 205 does not account for the introductory phrase to the last sentence: "[f]or the purposes of Chapter 1 of this title."
 
 
 51
 We read the last sentence of section 205 in conjunction with title nine's chapter one, the FAA, to perceive the sentence's meaning. The FAA's section 3 provides that "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration" and the court concludes that the parties agreed in writing to arbitrate, the court must stay the trial of the action until after arbitration proceedings. 9 U.S.C. § 3. The phrase "courts of the United States" as used in section 3 encompasses only constitutional courts established under Title 28, Chapter 5 of the United States Code. Jos. L. Muscarelle, Inc. v. American Timber & Trading Co., Inc., 404 F.2d 467, 469 (5th Cir.1968). So Congress incorporated the FAA's section 3 into the Convention Act and made it applicable to cases that are brought in state court and removed to federal court under section 205 by statutorily deeming those cases to have been "brought" in federal court.
 
 
 52
 Had Congress meant to provide defendants in Convention Act cases with an absolute removal right, it would not have qualified section 205's last sentence with "[f]or the purposes of Chapter 1 of this title." Moreover, Congress placed the sentence that Underwriters contend confers a significant and unique removal right at the end of section 205, after a technical, relatively insignificant rule that "the ground for removal provided in [section 205] need not appear on the face of the complaint but may be shown in the petition for removal." 9 U.S.C. § 205.
 
 
 53
 Also, there is nothing in the Convention Act's legislative history to suggest that Congress intended to accord a nonwaivable removal right to Convention defendants. Indeed, Ambassador Richard D. Kearney, Chairman of the Secretary of State's Advisory Committee on Private International Law, who explained the Convention Act's operation to the Senate Foreign Relations Committee, testified that the Convention Act only effected "minor changes" in the FAA for Convention cases and that section 205 "take[s] care of certain technical problems arising out of differences between the [FAA] and the convention." S.REP. NO. 702 at 5, 7. He also testified that section 205 "clarif[ies] the removal issue [by] provid[ing] a right to remove an action [falling under the Convention]." Id. at 7, 10. But neither he nor anyone else whose comments are preserved in the Convention Act's legislative history used the word "absolute" or "nonwaivable" in conjunction with section 205's removal right.
 
 D. THE EXPRESS WAIVER RULE
 
 54
 While neither Nutmeg nor section 205 dictates the legal result that obtains from this case's facts, we still find both authorities relevant. Together they suggest that although Congress made it easy for defendants in state-filed Convention cases to remove to federal court, defendants may contractually waive this privilege. That we enforce contractual forfeitures of removal rights, even in international arbitration cases, accords with the Convention's purpose of ensuring that parties to international business transactions can expect courts to enforce their specifications as to how their disputes will be resolved. See Mitsubishi, 473 U.S. at 629, 105 S.Ct. at 3355 ("concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' [arbitration] agreement, even assuming that a contrary result would be forthcoming in a domestic context").
 
 
 55
 But we still must specify the circumstances under which we will recognize a party's waiver of its Convention Act removal rights. There are four reasons why we will give effect only to explicit waivers of Convention Act removal rights.
 
 1. Reciprocity
 
 56
 Our decision in this case could jeopardize the international arbitration agreements of United States citizens who are not parties to this case. Underwriters and McDermott executed an ambiguous contract and disavowed any expressed intent regarding waiver of Convention Act removal rights. Therefore, we adopt the express waiver rule here to afford maximum protection to all those who rely on the Convention while respecting their freedom to agree upon procedures for resolving their disputes.
 
 
 57
 If we held that a party could be deemed to have waived its Convention Act removal rights by any legal standard less stringent than our express waiver rule, state courts would rule on more Convention issues. A major reason for the United States' twelveyear hesitancy in ratifying the Convention after it became available for adoption in 1958 was that
 
 
 58
 [i]n the courts of a majority of the states of the United States, foreign arbitral agreements [would] not be recognized, stays of conflicting litigation [would] not be granted, and a foreign arbitral award [would] still be unenforceable if the agreement was revoked prior to the handing down of the award.
 
 
 59
 Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 YALE L.J. 1049, 1074 n. 108, 1081 (1961). Although a majority of states have abandoned the common law hostility to arbitration,[13] see S.EXEC.REP. NO. 10, 90th Cong., 2d Sess. 7 (1968) (36 states enforce arbitration agreements), we are not certain that all states have done so or will not revert to the common law view of arbitration in the future. See, e.g., Sigal v. Three K's, Ltd., 456 F.2d 1242, 1243 (3d Cir.1972) (where Virgin Islands had no arbitration statute, contract's arbitration clause did not bar municipal court action).
 
 
 60
 We are even more concerned that some states have adopted constitutionally valid arbitration laws that would undermine the Convention Act in proceedings held in the courts of those states. Volt Info. Sciences, Inc. v. Board of Trustees, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) illustrates this point. In Volt, a California trial court applied Cal.Civ.Proc.Code Ann. § 1281.2(c) (West 1982) to stay arbitration proceedings while it resolved a suit between one of the parties to the arbitration dispute and a third party.[14] Volt, 109 S.Ct. at 1251. The Supreme Court acknowledged that the FAA applied to the arbitration agreement, but held that the FAA's sections 3 and 4 did not conflict with California's section 1281.2(c) because the parties' arbitration agreement specified that it was to be governed by California law. Id. at 1254-56. Had the Court not held that the parties agreed to have their contract interpreted under California law, section 1281.2 would conflict with this court's interpretation of the FAA's sections 3 and 4. See Sedco, 767 F.2d at 1148-50 (district court erroneously refused to stay litigation and compel arbitration although third party joined suit between parties to arbitration agreement).
 
 
 61
 Volt is instructive here because the Court found "some merit" in the argument that sections 3 and 4 of the FAA do not apply to state court proceedings, and noted that the Court has
 
 
 62
 never held that [the FAA's] §§ 3 and 4, which by their terms appear to apply only to proceedings in federal court, see 9 U.S.C. § 3 (referring to proceedings "brought in any of the courts of the United States"); § 4 (referring to "any United States district court"), are nonetheless applicable in state court. See Southland Corp. v. Keating, [465 U.S. 1] at 16, n. 10, 104 S.Ct. , at 861 n. 10 [79 L.Ed.2d 1 (1984) ] (expressly reserving the question whether " §§ 3 and 4 of the Arbitration Act apply to proceedings in state courts"); see also id., at 29, 104 S.Ct., at 867 (O'CONNOR, J., dissenting) (§§ 3 and 4 of the FAA apply only in federal court).
 
 
 63
 Id. at 1254 & n. 6; but see id. at 1256 n. 2 (BRENNAN, J., dissenting) (citing statement in Moses H. Cone, 460 U.S. at 26 nn. 34-35, 103 S.Ct. at 942 nn. 34-35 that "state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act;" arguing that California trial court's stay of arbitration conflicts with specific enforcement of arbitration agreements guaranteed by FAA § 2). We conclude from the Supreme Court's opinions that state courts do not necessarily have to grant stays of conflicting litigation or compel arbitration in compliance with the FAA's sections 3 and 4. See also Moses H. Cone, 460 U.S. at 27 n. 36, 103 S.Ct. at 942-43 n. 36 (before 1981, there was "considerable doubt" whether North Carolina courts would grant a section 3 stay of litigation over a construction contract); Jos. L. Muscarelle, Inc., 404 F.2d at 469 (only constitutional courts established by Title 28, Chapter 5 obliged to enforce FAA section 3); but see Econo-Car Int'l Inc. v. Antilles Car Rentals, Inc., 499 F.2d 1391, 1393 (3d Cir.1974) (despite Muscarelle, strong federal policy favoring enforcement of arbitration agreements suggests that Congress wanted federal district court for Virgin Islands to apply FAA).[15] Because the Convention Act virtually incorporates the FAA, see 9 U.S.C. § 208, state courts do not necessarily have to stay litigation or compel arbitration under the Convention Act either.[16]
 
 
 64
 States could also employ purely procedural mechanisms to undermine federal accession to the Convention. A state hostile to arbitration could force parties to endure litigation before permitting review of a trial court's arbitrability decisions. See, e.g., General Elec. Supply Co. v. Warden Elec., Inc., 38 Ohio St.3d 378, 528 N.E.2d 195, 198 (1988) (disavowing hostility to arbitration while holding "that an order of a trial court which denies a stay of litigation pending arbitration and grants a motion to dismiss the arbitration between parties that have contracted to arbitrate is not a final, appealable order"). A federal district court's order refusing to enforce an arbitration agreement is immediately appealable. Sedco, 767 F.2d at 1149.
 
 
 65
 If state courts refuse to promptly enforce arbitration agreements in Convention cases, other signatory nations could cite the Convention's reciprocity clause to justify departing from the Convention in cases involving citizens of states with recalcitrant courts. See Quigley, supra, 70 YALE L.J. at 1081-82. Our express waiver rule minimizes this danger by providing a bright-line standard for determining when parties surrender the full panoply of Convention Act rights. Because the Convention only permits other countries to reciprocally abrogate Convention covenants "to the extent" that our nation does, anomalous state court Convention decisions could only be raised against our citizens when they have expressly waived their Convention rights. See Convention Art. XIV.
 
 2. Uniformity
 
 66
 As the Delta court recognized, a restrictive construction of a district court's authority to remand certain types of cases fosters uniformity in that area of law. In Delta, Kentucky's Insurance Commissioner (the Commissioner) brought a state-court action against several reinsurers, including Banco de Seguros del Estado (Seguros). 900 F.2d at 891. Seguros, a foreign-state-owned company, qualified as a foreign sovereign under the Foreign Sovereign Immunity Act (FSIA), 28 U.S.C. § 1603. Seguros exercised its FSIA right to remove the case to federal court. See 28 U.S.C. § 1441(d). The Commissioner challenged Seguros' removal because Seguros executed an agreement that included a service-of-suit clause with terms identical to the clause at issue here. 900 F.2d at 891-92. The Delta court reversed the district court's remand, refusing to find a waiver of FSIA removal rights absent an "explicit" waiver of those rights. 900 F.2d at 894. The court concluded that the FSIA's purpose would best be served by "the development of a uniform body of [FSIA] law," and that uniformity is best served by trying all FSIA cases in federal court unless the parties unequivocally choose otherwise. Id.
 
 
 67
 We find this reasoning persuasive and applicable to Convention Act cases.
 
 
 68
 The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to ... unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.
 
 
 69
 Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974); see also I.T.A.D. Associates, Inc. v. Podar Bros., 636 F.2d 75, 77 (4th Cir.1981) (Convention interpretation "must not only observe the strong policy favoring arbitration, but must also foster the adoption of standards which can be uniformly applied on an international scale").
 
 
 70
 McDermott argues that the district court's remand does not compromise Convention Act uniformity because state courts must abide by the Convention Act. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 637 F.2d 391, 395 (5th Cir. Unit B 1981) ("state court is bound to apply the [FAA] if the statutory requisites are present"); Corcoran, 842 F.2d at 35 (state court must follow Convention Act). We disagree. Disunity is directly proportional to the number of authorities speaking on any subject. Institutional review procedure for state-court judgments also fosters disunity. At its discretion, the Supreme Court may review only final judgments or decrees of the highest court of a state in which a state trial court's Convention decision could be reviewed. See 28 U.S.C. § 1257; SUP.CT.R. 10.1. (b)-(c). By contrast, federal-district-court Convention decisions are appealable of right to a court of appeals, ensuring uniformity of federal decisions at least on a multi-state basis. See FED.R.APP.P. 3.
 
 
 71
 Desiring a unitary FSIA jurisprudence, " 'Congress deliberately sought to channel cases against foreign sovereigns away from the state courts and into federal courts....' " Proyecfin, 760 F.2d at 396-97 (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 497, 103 S.Ct. 1962, 1973, 76 L.Ed.2d 81 (1983)). Similarities between the removal statutes in the FSIA and the Convention Act indicate that Congress also sought unity by channelling Convention Act cases into federal courts. Compare 9 U.S.C. § 205 with 28 U.S.C. § 1441(d). Both statutes permit removal based on the foreign domicile of a defendant, regardless of the questions raised by the case or the amount in controversy. Under section 1441(d), a defendant may remove "at any time for cause shown," and under section 205, a defendant may remove "at any time before the trial." Other cases may be removed only within 30 days after the defendant receives a pleading. See 28 U.S.C. § 1446(b).
 
 3. Precedent
 
 72
 Even in cases that do not involve the Convention or the FSIA, many federal courts have refused to find a contractual waiver of removal rights absent a "clear and unequivocal" expression of intent to waive those rights. Regis, 894 F.2d at 195; Weltman v. Silna, 879 F.2d 425, 427 (8th Cir.1989); Links Design, Inc. v. Lahr, 731 F.Supp. 1535, 1536 (M.D.Fla.1990); John's Insulation, Inc. v. Siska Constr. Co., Inc., 671 F.Supp. 289, 294 (S.D.N.Y.1987); Morgan Dallas Corp. v. Orleans Parish School Board, 302 F.Supp. 1208, 1209 (E.D.La.1969); accord J. MOORE & B. RINGLE, 1A MOORE'S FEDERAL PRACTICE p 0.157 at 152; but see General Phoenix Corp. v. Malyon, 88 F.Supp. 502, 503 (S.D.N.Y.1949) (recognizing possibility that service-of-suit clause only waived objections to personal jurisdiction, but interpreting contract to waive removal rights). Nutmeg is also conceptually consistent with the "unequivocal expression rule" because the court premised its decision on its belief that the only possible significance of that case's forum selection clause was to waive removal rights. 931 F.2d at 15-16; see also Keaty, 503 F.2d at 956-57 (no waiver of removal rights where forum selection clause does not "on its face, clearly limit[ ] actions thereunder to the courts of a specified locale" and party seeking remand drafted clause).
 
 
 73
 The Foster court criticizes all of these authorities as inconsistent with "the fact that for 'approximately five score years' the federal courts 'have construed the removal statutes strictly and, on the whole, against the right of removal.' " 933 F.2d at 1217-18 n. 15 (quoting Moore's p 0.157[1.-3] at 38 (emphasis added)). But the court's criticism cannot apply to FSIA or Convention Act cases because in these instances, Congress created special removal rights to channel cases into federal court. See id. (distinguishing Delta because the Sixth Circuit "was primarily driven by considerations peculiar to the FSIA" in adopting the express waiver rule); see also Butler v. Polk, 592 F.2d 1293, 1296 (5th Cir.1979) (refusing to find error in removal procedure while recognizing that "ambiguities are generally construed against removal"); compare 14A CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3721 at 223 (2d ed.1985) (finding "persuasive" cases construing service-of-suit clause as a waiver of removal rights) with id. § 3729 at 487 ("a federal court probably would consider the congressional objective of keeping the federal courts open to foreign states to be paramount and therefore accept jurisdiction" despite express waiver of removal rights).
 
 4. Speed
 
 74
 Where parties have executed valid arbitration agreements, judicial enforcement of arbitration agreements and awards ought to be "summary and speedy" out of respect for the parties' bargain to keep their disputes out of court. See Moses H. Cone, 460 U.S. at 27, 103 S.Ct. at 943; see also Imperial Ethiopian Gov't v. Baruch-Foster Corp., 535 F.2d 334, 335 (5th Cir.1976) (consistent with Convention purpose, Convention Act prescribes summary procedure to expedite petitions for confirmation of foreign arbitral awards). Future forum choice disputes in Convention cases will not languish in this court under our bright-line express waiver rule. See Delta, 900 F.2d at 894 (express waiver rule necessary "to provide maximum guidance for future cases").
 
 IV. CONCLUSION
 
 75
 We VACATE the Remand Order and return the case to the district court.
 
 
 
 [1]
 In re Merrimack Mut. Fire Ins. Co., 587 F.2d 642 (5th Cir.1978) represents this court's jurisprudence on remand reasoning disclosure. The Merrimack court refused to compel a district judge to state a permissible ground for remand where the court's order was ambiguous as to remand propriety. Id. at 647-48. We question the continuing validity of Merrimack because it relies on the Supreme Court's statement in Thermtron Products, Inc. v. Hermansdorfer, 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976) that 28 U.S.C. § 1447(c) "states the exclusive grounds for remand." Merrimack, 587 F.2d at 644. The Court has retreated from this absolutist view of § 1447(c). See Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 621-22, 98 L.Ed.2d 720 (1988) (Thermtron does not limit district court's discretion to remand pendent claims to state court rather than dismiss them). Because the permissible grounds and means of reviewing remand orders have expanded considerably since Merrimack's strict adherence to Thermtron, and the availability and means of appellate review turns exclusively on the district court's reason for remand, district courts should take care to explain their reasons for remanding cases
 
 
 [2]
 Section 1291 provides, "[t]he courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States, ... except where a direct review may be had in the Supreme Court."
 
 
 [3]
 But see 15 WRIGHT, MILLER, AND COOPER, FEDERAL PRACTICE AND PROCEDURE § 3914 at 549-50 (1976) ("[i]f the [Thermtron ] Court had specifically focused on the method of review, it would have been better advised to recognize the availability of appeal")
 
 
 [4]
 Cohill does not mention Moses H. Cone
 
 
 [5]
 McDermott wants us to review this case under mandamus standards which are more deferential to the district court's decision than appeal standards. See In Re First South Sav. Ass'n, 820 F.2d 700, 714-15 (5th Cir.1987), Southern Pacific Transp. Co. v. San Antonio, Tex., 748 F.2d 266, 270 (5th Cir.1984) (mandamus is extraordinary, discretionary writ only available to remedy clear abuse of discretion). McDermott argues that Corcoran v. Ardra Ins. Co., Ltd., 842 F.2d 31, 36 (2d Cir.1988) properly considers Moses H. Cone, but still holds that Thermtron and Cohill require that a court's discretionary remand order be reviewed by mandamus
 We think that Corcoran is wrongly decided. The Corcoran court felt obliged by Cohill to review the district court's discretionary remand order by mandamus. Id. at 35. But we have previously explained that Cohill did not address the proper means of review of a discretionary remand order. Moreover, the Corcoran court did not adequately distinguish Karl Koch Erecting Co. v. New York Convention Center Development Corp., 838 F.2d 656 (2d Cir.1988), where the Second Circuit followed Pelleport Investors, Inc. v. Budco Quality Theatres, Inc., 741 F.2d 273, 278 (9th Cir.1984), which followed Moses H. Cone in ruling that contractual remand orders are reviewable by appeal. See Karl Koch, 838 F.2d at 658. The Corcoran court attempted to distinguish Karl Koch on the ground that the effect of the contractual remand order in Karl Koch was to determine the forum in which the litigation would be decided, whereas the effect of the discretionary remand order in Corcoran was only to determine which forum would decide the arbitrability question. Corcoran, 842 F.2d at 35. This reasoning fails to consider that Moses H. Cone, on which Karl Koch relies, treated as appealable an order that, like the orders at issue here and in Corcoran, only decided which forum would decide the arbitrability question. See Moses H. Cone, 460 U.S. at 11-13, 103 S.Ct. at 934-35.
 
 
 [6]
 Because the district court's remand order so closely parallels the stay order at issue in Moses H. Cone, it qualifies as a collateral order under this court's rendition of the collateral order doctrine's requisites:
 (1) the order must finally dispose of a matter so that the district court's decision may not be characterized as tentative, informal or incomplete; (2) the question presented must be serious and unsettled; (3) the order must be separable from, and collateral to, rights asserted in the principal suit; and (4) there should generally be a risk of important and probably irreparable loss if an immediate appeal is not heard.
 Acosta v. Tenneco Oil Co., 913 F.2d 205, 207 (5th Cir.1990).
 
 
 [7]
 Though the Court stated in Thermtron that remand orders are not final judgments reviewable by appeal, Moses H. Cone characterized the collateral order doctrine as an "exception to the finality rule." 460 U.S. at 11, 103 S.Ct. at 934
 
 
 [8]
 In New Orleans Public Service, Inc. v. Majoue, 802 F.2d 166, 167 (5th Cir.1986), this court stated that "[t]he only vehicle for relief from a remand order is the writ of mandamus." But because the Majoue court held that section 1447(d) deprived it of jurisdiction over the appeal, we disregard this statement as dicta. It is also incorrect dicta in light of Thermtron's limited holding that "mandamus is an appropriate remedy to require the District Court to entertain [a] remanded action." 423 U.S. at 352, 96 S.Ct. at 593 (emphasis added); accord In re Allied-Signal, Inc., 919 F.2d 277, 279 (5th Cir.1990)
 
 
 [9]
 The policy also permits the parties to have "a court of competent jurisdiction within the limits of the United States of America" choose a neutral third umpire. Policy p 9
 
 
 [10]
 Consent to personal jurisdiction is of value especially with respect to defendants that are incorporated and have their principal place of business abroad. See Hart, 453 F.2d at 1361
 
 
 [11]
 We need not here decide whether to apply the policy drafter principle in Underwriters' favor. Cf. 1 A. Parks, THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE, 123-24 (insured's broker who prepares slip should be policy offeror)
 
 
 [12]
 The district court held that the last sentence of section 205 does not vest exclusive jurisdiction over Convention cases in the federal courts. The court's holding is correct; the language and history of the Convention Act indicate nothing other than Congress' intent to grant federal courts concurrent jurisdiction over Convention cases and defendants a right to remove state-filed Convention cases to federal court. See 9 U.S.C. § 203 (federal district courts have "original jurisdiction" over Convention cases); 9 U.S.C. § 205 (removal right); S.REP. NO. 702; HOUSE COMM. ON THE JUDICIARY, FOREIGN ARBITRAL AWARDS CONVENTION, H.REP. NO. 1181, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3601-04 (never mentioning exclusive federal jurisdiction); Gulf Offshore Co., Div. of Pool Co. v. Mobil Oil Corp., 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981) ("presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests"). But the court's holding as to exclusive jurisdiction did not answer Underwriters' argument
 
 
 [13]
 See Sedco, 767 F.2d at 1145 n. 12 (common law hostility toward arbitration stems from jurisdictional jealousy)
 
 
 [14]
 The California court stayed arbitration to avoid the risk of conflicting rulings on common issues of fact between the arbitration proceeding and the state court action
 
 
 [15]
 The Econo-Car court explained the consequences of the FAA not applying to state courts:
 a party may well defeat any attempt specifically to enforce an agreement to arbitrate in the [state court] since the party seeking arbitration would then be remitted to local law. There [would then be no arbitration where there] is no [state] statute providing for specific enforcement of arbitration agreements, [because] at common law such agreements are not specifically enforceable.
 Id. at 1392 n. 2.
 
 
 [16]
 The Convention Act has its own arbitration compulsion provision:
 A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States....
 9 U.S.C. § 206. But the only courts "having jurisdiction under [the Convention Act]" are federal. See 9 U.S.C. § 203 (district courts have original jurisdiction of Convention cases); see also 115 Cong.Rec. 40141 (1970) ("Section 206 permits a court to direct that arbitration be held at the place provided for in the arbitration agreement. Since there may be circumstances in which it would be highly desirable to direct arbitration within the district in which the action is brought and inappropriate to direct arbitration abroad, section 206 is permissive...."). So section 206, like the FAA's section 4, arguably confers no authority on state courts to compel arbitration.